[Cite as *State v. Ihrabi*, 2017-Ohio-8373.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 27277 |
| | : | |
| v. | : | T.C. NO. 12-CV-2995 |
| | : | |
| RIBHY IHRABI | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# **O P I N I O N**

Rendered on the 31st day of October, 2017.

. . . . . . . . . . .

ADAM M. LAUGLE, Atty. Reg. No. 0092013, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

EUGENE ROBINSON, Atty. Reg. No. 0010477, 131 N. Ludlow Street, Suite 304, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Ribhy Ihrabi appeals from a judgment of the Montgomery County Court of Common Pleas, which overruled his objections to the magistrate's decision and granted the State's petition for forfeiture of currency. The trial court ordered that $34,255 be forfeited as "proceeds" and an "instrumentality." For the following reasons, the trial court's judgment will be affirmed in part, reversed in part, and remanded for further proceedings, as described below.

## I. Background and Procedural History

{¶ 2} Ihrabi operated a business known as A&R1 Smoke Shop on Dayton-Yellow Springs Road in Fairborn. The business sold tobacco products, "herbal incense," smoking accessories such as pipes, soda pop and other non-alcoholic beverages, and some clothing items and costume jewelry. Prior to October 17, 2011, approximately 50% of the business's sales could be attributed to the sale of synthetic marijuana.

{¶ 3} The record reflects that synthetic marijuana is the term for a variety of different chemical compounds that produce effects similar to marijuana; the compounds are usually sprayed onto plant material. Synthetic marijuana is usually smoked, and depending on the specific compound, the synthetic marijuana can be much more potent than marijuana. The synthetic drug known as "bath salts" is different from synthetic marijuana; it is derived from the drug Cathinone, which comes from the Khat plant. Bath salts typically come in powdered form, and their side effects and complications are more severe than those from synthetic marijuana.

{¶ 4} On October 17, 2011, the sale of controlled-substance analogs, such as synthetic marijuana, became illegal in Ohio. *See* 2011 Sub.H.B. 64; *State v. Shalash*,

148 Ohio St.3d 611, 2016-Ohio-8358, 71 N.E.3d 1089 (concluding that H.B. 64 criminalized controlled-substance analogs). After that time, Sergeant Rhett Close of the Riverside Police Department investigated the sale of synthetic marijuana and bath salts. His investigation led him to Ihrabi, and on April 19, 2012, Riverside police officers searched Ihrabi's store, vehicle, apartment, and storage unit. Numerous items were seized, including approximately $34,255 in United States currency; $30,000 of that money was located in a trash can in Ihrabi's apartment in Montgomery County.

{¶ 5} On April 25, 2012, the State of Ohio filed a petition for civil forfeiture, pursuant to R.C. 2981.05,[1] seeking the forfeiture of the $34,255 that had been seized by the police; the petition was assigned a civil case number, 2012-CV-2995, which is the matter on appeal. The State alleged that the currency was either contraband, proceeds, and/or an instrumentality of drug possession or drug trafficking. In his Answer, filed on July 9, 2012, Ihrabi admitted that the police had removed approximately $34,255 in cash, as well as records pertaining to his business, but he denied the State's additional allegations.

{¶ 6} In November 2012, a grand jury declined to indict Ihrabi.

{¶ 7} On December 27, 2012, Ihrabi moved for the release of his seized property. Ihrabi itemized fifteen items of personal property that were seized by the Riverside police, including paperwork, jars, receipts, packages of "Maya Blue" Spice, stickers, and cash found in various locations. Ihrabi noted that the State sought to forfeit only the seized currency, that the tangible property seized in Greene County was not necessary to the prosecution of charges in Montgomery County, and that a no true bill was filed in

---

[1] Effective April 6, 2017, the Ohio legislature substantially modified the statutes governing criminal and civil asset forfeiture. Sub.H.B. 347 (2016). All statutory references in this Opinion refer to the prior version of R.C. Chapter 2981.

Montgomery County concerning potential criminal charges. Ihrabi further stated that the seized items were necessary for him to conduct his business.

{¶ 8} A forfeiture hearing on the State's civil petition was held before a magistrate on August 21 and 22, 2013, following which the parties submitted post-trial memoranda. On January 9, 2014, the magistrate found, by a preponderance of the evidence, that Ihrabi had engaged in aggravated trafficking of drugs by selling a controlled substance or controlled substance analog. The magistrate further found that "the totality of the circumstances suggests that the money was 'proceeds' of the sale of synthetic marijuana and/or an 'instrumentality' that would be used to purchase additional synthetic marijuana for future sale at the Smoke Shop." The magistrate concluded that the money was subject to forfeiture as proceeds and an instrumentality, because the seized cash was traceable to Ihrabi's trafficking in synthetic marijuana generally, even if it could not be traced to specific transactions. Finally, with respect to the instrumentality finding, the magistrate found that forfeiture was not disproportionate to the offense of trafficking synthetic marijuana.

{¶ 9} Ihrabi filed objections to the magistrate's ruling. On December 2, 2014, the trial court overruled the objections and adopted the magistrate's ruling. Ihrabi appealed from the trial court's decision, *State v. Ihrabi*, 2d Dist. Montgomery No. 26537, but we dismissed that appeal for lack of a final appealable order. *Id*. (Decision and Final Judgment Entry (Feb. 20, 2015)). On August 24, 2016, the trial court filed an amended final entry, which overruled Ihrabi's objections, adopted the magistrate's decision, and ordered that the $34,255 be forfeited as proceeds and as an instrumentality and that the currency be distributed as follows: (1) $8,563.75 to the Prosecuting Attorney's account,

and (2) $25,691.24 for use and/or disposition by the law enforcement trust funds of the City of Riverside.

{¶ 10} Ihrabi appeals from the trial court's judgment, raising two assignments of error.

## II. Order of Forfeiture

{¶ 11} On appeal, Ihrabi summarizes his arguments as follows:

1. There was no competent evidence Defendant sold banned tobacco products at his store or that he was aware anyone else did so.

2. Plaintiff failed to establish that money seized from Defendant's store, automobile and apartment was subject to forfeiture.

In essence, Ihrabi claims that the trial court erred in concluding that the seized currency was property subject to forfeiture.

{¶ 12} R.C. Chapter 2981 permits "[a] law enforcement officer [to] seize property that the officer has probable cause to believe is property subject to forfeiture." R.C. 2981.03(A)(2). A State or political subdivision acquires provisional title to property subject to forfeiture, upon commission of an offense giving rise to forfeiture. R.C. 2981.03(A)(1). This provisional title is subject to claims of third parties and a final forfeiture adjudication. R.C. 2981.03(A)(1); *State v. Jamison*, 2d Dist. Montgomery No. 23211, 2010-Ohio-965, ¶ 21.

{¶ 13} R.C. 2981.02 allows the forfeiture of contraband, proceeds, and certain instrumentalities. *See* R.C. 2981.01(B)(13) (defining "property subject to forfeiture"); *State v. Moreno*, 2017-Ohio-479, __ N.E.3d __, ¶ 20 (2d Dist.); *State v. Recinos*, 5th Dist. Richland No. 14CA9, 2014-Ohio-3021, ¶ 21. In cases involving unlawful goods,

"proceeds" means any property derived directly or indirectly from an offense. R.C. 2981.01(B)(11)(a). " 'Proceeds' may include, but is not limited to, money or any other means of exchange." *Id.* For purposes of the forfeiture statute, an "offense" is defined as "any act or omission that could be charged as a criminal offense or a delinquent act, whether or not a formal criminal prosecution or delinquent child proceeding began at the time the forfeiture is initiated." R.C. 2981.01(B)(10). An "instrumentality" is "property otherwise lawful to possess that is used in or intended to be used in an offense." R.C. 2981.01(B)(6). Money can also constitute an instrumentality. *Id.*

{¶ 14} A prosecuting attorney may pursue forfeiture of seized property in a criminal proceeding under R.C. 2981.04, a civil proceeding under R.C. 2981.05, or both. R.C. 2981.03(F). Criminal forfeiture is initiated by including in the charging instrument a specification consistent with R.C. 2941.1417 or by providing the defendant with "prompt notice," in conformity with Crim.R. 7(E). R.C. 2981.04(A)(1) and (A)(2). In contrast, a civil forfeiture proceeding is initiated by the prosecutor's filing of a civil complaint requesting the forfeiture of property that is located within the jurisdiction of the prosecutor's political subdivision and that is alleged to be connected to an offense as contraband, proceeds, or an instrumentality. R.C. 2981.05(A). The forfeiture proceedings against Ihrabi were civil in nature.

{¶ 15} "In a civil forfeiture proceeding brought under R.C. 2981.05, the prosecutor must prove by a preponderance of the evidence that the property is subject to forfeiture because the property meets the definition of contraband, proceeds, or an instrumentality. *See* R.C. 2981.05(D). The trial court shall issue a civil forfeiture order if the court determines that the prosecutor has met his burden under the statute and a finding is

made, when required, that forfeiture is not disproportionate to the severity of the offense. *Id.*" *In re Forfeiture of Property of Rhodes*, 2d Dist. Montgomery No. 25464, 2013-Ohio-3046, ¶ 9.

### A. Evidence that Ihrabi Committed an Offense

{¶ 16} At the forfeiture hearing, the State presented three witnesses: (1) Sergeant Close, (2) Corey Hernandez, a former employee of A&R1 Smoke Shop, and (3) Laureen J. Marinetti, the chief forensic toxicologist at the Miami Valley Regional Crime Lab (MVRCL). Ihrabi testified on his own behalf, and offered two additional witnesses: (1) Teresa Budd, another former employee of A&R1 Smoke Shop, and (2) Richard Rosinski, a distributor.

{¶ 17} Sgt. Close testified that the investigation into Ihrabi's sale of synthetic marijuana stemmed from the officer's investigation of One Stop (which Close also referred to as Short Stop), a convenience store operated by Hossein Mirdamad on Linden Avenue in Riverside. In November 2011, Close and other officers searched One Stop, pursuant to a search warrant, and found a large quantity of bath salts and synthetic marijuana. At that time, Mirdamad had identified "Robbie" as his supplier.

{¶ 18} A second search of One Stop was conducted in April 2012, and Mirdamad told investigators that Robbie was having another person, "Steve," supply for him. The officers later identified "Steve" as Ghaleb Salah. Salah delivered bath salts to Mirdamad as part of a controlled buy, and the officers found hundreds of units of synthetic marijuana, in addition to bath salts, inside Salah's vehicle; the box in the vehicle was marked "A&R1 Smoke Shop." (Mirdamad was subsequently convicted of aggravated trafficking in drugs, among other offenses.)

{¶ 19} On April 17, 2012, officers executed a search warrant at Salah's residence and located thousands of units of synthetic marijuana, several hundred units of bath salts, guns, money, and shipping information. Shipping labels inside Salah's residence were addressed to A&R1 Smoke Shop on Dayton-Yellow Springs Road. Close testified, "We also found other documents that led to that [A&R1 Smoke Shop] with his [Ihrabi's] name on it and that address." (Salah was subsequently convicted of aggravated possession of drugs and aggravated trafficking in drugs.)

{¶ 20} Sergeant Close obtained FedEx records that showed deliveries from known distributors of synthetic marijuana and/or bath salts from around the country; the records had Ihrabi's name and address on them.

{¶ 21} On April 19, 2012, Close, along with other members of his police department and members of the ACE Task Force, executed a search warrant at A&R1 Smoke Shop. In the back area of the store, the officers found "thousands of empty containers, five-gram clear containers, in addition to labeling for known names of synthetic marijuana." Close testified that the five-gram containers were "identical or at least similar" to containers in which he had previously found synthetic marijuana.

{¶ 22} The officers located one jar of suspected synthetic marijuana labeled as "Blue Sky" and a one-gram packet of suspected synthetic marijuana labeled "Maya Blue." An empty package of "Flameboy" was found but not collected; Close testified that Flameboy is "another name that has been used in other investigations for synthetic marijuana" and that it was also located at Mirdamad's shop.

{¶ 23} The officers also found "shipping statements, invoices, with other shipping companies or retail companies that sell synthetic marijuana and/or bath salts," as well as

lab reports which purported to state the chemical compounds contained in the name-brand synthetic marijuana. Close testified that, through his investigations, he has found that those lab reports are not accurate. Invoices at the shop stated "Ordered by Robbie" and included the name and address of A&R1 Smoke Shop.

{¶ 24} At the time of the raid, Ihrabi had $70 on his person, the store's cash register contained $435, and $250 was located in a filing cabinet in the back portion of the store. $3,500 was found in Ihrabi's Honda, located outside the store.

{¶ 25} Sgt. Close testified that, when he spoke with Ihrabi, Ihrabi initially stated that he had stopped selling synthetic marijuana when it was banned in Ohio. Ihrabi later told Close that he had stopped selling what he was told was illegal, but continued to sell the synthetic marijuana that was still legal; Ihrabi told Close that he had never sold bath salts. Ihrabi admitted that he knew Salah, and initially stated that he had known Salah for 30 years. Ihrabi later stated that he had known Salah for eight years, but had not seen Salah in six or seven months. The State presented a photo found on Salah's phone, taken approximately four months before the raid on A&R1 Smoke Shop, which showed Salah and Ihrabi.

{¶ 26} Ihrabi consented to a search of a storage locker where he stores items from the shop, of his vehicle, and of his apartment. The officers found counterfeit shoes and a "knockoff" of Viagra, but no synthetic marijuana or bath salts. The officers originally thought the Viagra was bath salts, and Close noticed a "visible change in Mr. Ihrabi's demeanor" when the officer who found the drugs stated what he thought he had found. Close also noticed, based on the dust pattern on the floor, that additional boxes had recently been there.

{¶ 27} In the apartment, the officers found $30,000 in cash in Ihrabi's kitchen trash can under the trash bag. The officers also found a travel itinerary to Las Vegas and invoices from companies which Close knew, from his experience, were involved in investigations of synthetic marijuana.

{¶ 28} In testifying about the invoices recovered from Ihrabi, Sgt. Close indicated that synthetic marijuana was listed as "incense" or "Spice," not as synthetic marijuana. Close indicated the listed prices for incense that was actually synthetic marijuana were significantly higher ($40 to $80 per ounce) than traditional (legal) incense ($0.50 to $2 per ounce). Close also testified about notebooks seized from inside A&R1 Smoke Shop. With respect to State's Exhibit 72, he indicated that the notebook listed "Rave On" and "Zen," which are brands of bath salts; Close stated that this information was consistent with Mirdamad's statements to Close that Robbie was his supplier.

{¶ 29} Jennifer Watson of MVRCL analyzed the contents of the jar labeled "Blue Sky" and the packet labeled "Maya Blue;" the parties stipulated to Watson's written report (State's Exhibit 3). According to the report and stipulation, the Blue Sky jar contained 3.10 grams (plus or minus 0.04 grams) of AM-2201, as well as RCS-4. The chemical structures of those substances are substantially similar to the chemical structure of JWH-018, a Schedule I drug. The Maya Blue packet contained 2.78 grams (plus or minus 0.04 grams) of JWH-018, a Schedule I controlled substance.

{¶ 30} Laureen Marinetti, chief forensic toxicologist at MVRCL, testified that AM-2201 is "one of those compounds that was created to be similar to or in the family of tetrahydrocannabinol [the chemical in marijuana] * * *, and its stimulant, depressant, or hallucinogenic effects are greater than the effects of marijuana. Marinetti testified that

RCS-4 is another compound in the family of tetrahydrocannabinol, and its effects are similar to marijuana. She stated that JWH-018 was one of the first compounds to mimic marijuana, and it is now a Schedule I controlled substance; JWH-018's effects are greater than marijuana, but not as great as AM-2201.

{¶ 31} Corey Hernandez testified that he worked at A&R1 Smoke Shop from July 2011 until February or March 2013; he worked three to five days per week, nine hours each day, usually noon to 9:00 p.m. Another employee and/or Ihrabi were also in the store when Hernandez worked. Hernandez assisted customers and ran the cash register. Hernandez referred to Ihrabi as "Robbie."[2]

{¶ 32} Hernandez testified that, after October 17, 2011, he sold some products that were "Ohio-safe products." "Ohio-safe products" had a sticker that said "Ohio Safe," and Robbie told Hernandez that the products were legal. At one point, Hernandez testified that he did not sell any products that were not Ohio-safe products after October 17, but he later testified that he had sold "incense" and "Spice," meaning synthetic marijuana, that did not have the "Ohio Safe" label on it. Hernandez indicated that some of the products that had been labeled "Ohio Safe" began to look different and no longer carried the label. Hernandez stated that the sale of synthetic marijuana slowed, but did not stop, after October 17, 2011.

{¶ 33} Hernandez testified that he was at A&R1 Smoke Shop when the store was searched by law enforcement on April 19, 2012. Hernandez stated that he assumed the officers were there "for Spice." Hernandez indicated that the store was "selling it," and

---

[2] Both the transcript of the forfeiture hearing and various invoices are inconsistent regarding the spelling of "Robby." It appears as both "Robby" and "Robbie." For sake of consistency, we elect to use "Robbie" throughout.

he personally sold synthetic marijuana "a couple of times." Customers would ask for "incense," and Hernandez would get the synthetic marijuana from a location near the cash register. Hernandez testified that Robbie told him the price for the five-gram jar, which could be $5 or $10 or higher. Hernandez recalled several brands, such as 303 California, California Kush, and Fire. Hernandez stated that customers would come in to buy it "to get high on" and they would smoke it. Some customers asked Hernandez which one could get them the highest for the price. Hernandez testified that "usually more expensive was either better or bigger." Hernandez heard Robbie tell customers it would be "the best of the best."

{¶ 34} Hernandez testified that A&R1 Smoke Shop did not sell bath salts. However, he believed that a person called Steve (Salah) was selling bath salts from the store. Hernandez testified that "junkie-looking-like people would come in and he [Salah] would leave with those people * * * and be gone about five, ten minutes, 15, 20 maybe * * * and then he'll come back and the customer wouldn't be back with him." Hernandez recalled that one customer asked for bath salts and stopped coming, but started coming again when Salah was there. Hernandez stated that Salah was at the store two or three times per week for four or five hours per day, and that Salah would sit behind the counter; three or four people came to see Salah on a single day. Hernandez testified that Salah was at the store the week before the April 19, 2012 search of A&R1 Smoke Shop.

{¶ 35} During his testimony, the prosecutor showed Hernandez a photograph of the five-gram jars. Hernandez testified that the incense was sold in jars like that, and that nothing else was sold from the store in those jars. Hernandez testified that, after the April 19 raid, he did not see Robbie sell any synthetic drugs from the store, and the sale

of paraphernalia slowed "a lot." Hernandez estimated that the number of customers was "cut in half maybe."

{¶ 36} Hernandez testified that, in the few days before the April 19 raid, Ihrabi acted "more paranoid" and told customers, "I'm not selling it no more." After the raid, Ihrabi told Hernandez that the police were only looking for bath salts.

{¶ 37} The first witness for Ihrabi was Teresa Budd, an employee at A&R1 Smoke Shop since February 2011. She testified that she was familiar with one kind of synthetic marijuana – Spice or K2 – and that it was illegal. Budd stated that the store never sold Spice, but sold herbal incense, which Budd believed was different from synthetic marijuana. Budd stated that the store obtained herbal incense products (such as California Chronic and Funky Monkey) from a company called S.A. Wholesale.

{¶ 38} Budd testified that the store stopped carrying herbal incense when the law changed in October 2011; at that time, Ihrabi got rid of the herbal incense that he had by sending it to business associates in other states, sending product back to the companies from which he had gotten it, or putting it in the trash. After October 2011, Budd was not aware of any herbal incense remaining in the store or being ordered by Ihrabi. She stated that the policy if any customer asked for synthetic marijuana was to inform the customer that it was illegal and the store did not carry it. Budd relied on the chemical reports that came with the products and her employer's knowledge as to whether a product contained illegal substances. Budd stated that the store did not sell bath salts. Budd was not present on April 19, 2012, when the search warrant was executed.

{¶ 39} Budd was familiar with Salah, and stated he would come to the store "twice a week sometimes, but not every week." She was not aware of Salah's selling any illegal

substances to people who came into the store.

{¶ 40} Richard Rosinski testified that he met Ihrabi in 2009, when he (Rosinski) worked for TWD Distributing, a company from which Ihrabi's store had purchased products. Rosinski's sales territory changed in 2010, but he remained friends with Ihrabi. Rosinski was aware that, in November 2010, the federal government banned five different chemicals nationwide, and four more were banned in March 2011. Rosinski indicated that some companies reformulated their products after their products became illegal. Rosinski occasionally visited Ihrabi's store after October 17, 2011, and he did not see any products that violated state or federal law. Rosinski once saw Ihrabi turn a customer away who was seeking an illegal product.

{¶ 41} Finally, Ihrabi testified that he discarded any merchandise with synthetic chemicals prior to October 17, 2011, and that he told his employees that the merchandise could not be sold any more. Ihrabi stated that he regularly receives samples from companies, but they are thrown away. Ihrabi indicated that the items found on April 19, 2012, were intended to be thrown away.

{¶ 42} Ihrabi denied that Hernandez sold illegal products from his store, and he denied knowing of the sale of bath salts by Salah or anyone else outside his store. Ihrabi also denied selling products to Mirdamad or supplying him with herbal incense. Ihrabi testified that after October 17, 2011, he only sold herbal smoke, which was legal. When asked about FedEx packages picked up by various people, Ihrabi denied knowing about the orders and suggested that others may have used his store's name.

{¶ 43} Ihrabi testified that, on April 19, 2012, he informed officers about his storage unit, and he agreed to the search of his storage unit, car, and apartment. He stated that

he informed Sgt. Close about the money in the car and the apartment. Ihrabi testified that the money was from the sale of legitimate products in his business.

{¶ 44} In finding that the State had met its burden to establish that the seized currency was subject to forfeiture, the magistrate found the testimony of Hernandez "to be highly credible and convincing." The magistrate stated: "Mr. Hernandez'[s] testimony indicates that Respondent continued to sell synthetic marijuana from his store even after the ban and that Respondent facilitated the sale of 'bath salts' by another individual, Mr. Salah aka 'Steve.' " The magistrate found Ihrabi's testimony that he stopped selling synthetic marijuana after the October 17, 2011 ban to be not credible. The magistrate found that, after October 17, 2011, Ihrabi "pre-screened" customers, only selling to those who asked for synthetic marijuana by a certain name. The magistrate also found that circumstantial evidence -- such as Ihrabi's demeanor during the search of the storage unit, the presence of labeling and packaging material for synthetic marijuana, and indications that boxes had recently been removed from the storage locker – also suggested that Ihrabi continued to sell synthetic marijuana after the ban. The trial court adopted the magistrate's findings.

{¶ 45} We recognize that only approximately six grams of synthetic marijuana were located in Ihrabi's store. However, based on the totality of the evidence, the trial court reasonably found that Ihrabi continued to sell synthetic marijuana after the October 2011 ban. Hernandez's testimony that Ihrabi continued to sell synthetic marijuana after the ban was substantiated, in part, by Ihrabi's business records and testimony. When the prosecutor pointed out on cross-examination that, according to tax returns, A&R1 Smoke Shop's cost of goods in 2009 was $198,282 and had risen to $1,004,265 in 2011, Ihrabi

responded that, in 2009, business was "slow," but he began to make money when he sold "herbal incense." (Tr. at 423.) Ihrabi stated: "We invested our money in that business and, yes, in 2000 – if you go back to 2009 and you look [at] my inventory in the store in the beginning of the year, I have maybe 20, $25,000. If you look in my inventory the beginning of 2011 was $129,000 or more maybe, you know, $135,000 I have in merchandise I have in my store." The notebooks of the store's monthly receipts for November 2009 (Ex. 77), January 2010 (Ex. 78), October 2010 (Ex. 79), December 2010 (Ex. 81), March 2012 (Ex. 82), and April 2012 (Ex. 83), show that the monthly sales in November 2009 and January 2010 were significantly lower than the monthly sales in October 2010, December 2010, March 2012, and April 2012.

{¶ 46} Ihrabi indicated that, in 2011, he purchased a large amount of herbal incense from S.A. Wholesale. Invoices and shipping records seized by the State indicated that A&R1 Smoke Shop continued to purchase goods from S.A. Wholesale into 2012. A February 7, 2012 invoice from S.A. Wholesale showed that Ihrabi had made purchases totaling more than $300,000 since October 19, 2011. Shipping records indicated that Ihrabi placed numerous orders with Spice King, another distributor known to law enforcement for distributing synthetic marijuana.

{¶ 47} There was no evidence that Ihrabi personally sold bath salts from A&R1 Smoke Shop, but the trial court could have reasonably concluded that Ihrabi knew Salah was selling bath salts out of his store. Hernandez described Salah's access to the store and how Salah used the store as a location to meet customers. In addition, Sgt. Close testified that, when Salah delivered bath salt to Mirdamad as part of a controlled buy, the box in the vehicle was marked "A&R1 Smoke Shop." In addition, when officers executed

a search warrant at Salah's residence, they located thousands of units of synthetic marijuana, several hundred units of bath salts, guns, money, and shipping information; the shipping labels inside Salah's residence were addressed to A&R1 Smoke Shop on Dayton-Yellow Springs Road. The State's evidence also included two checks from A&R1 Trading, Inc. (the official name of Ihrabi's business) to Aashir Z Distributors in March 2012: one for $5,000, and a second for $3,000; another exhibit indicated that Salah was associated with Aashir Z Distributors' account.

{¶ 48} In summary, upon review of the evidence at the forfeiture hearing, the trial court's conclusion that Ihrabi had committed a felony offense, *i.e.*, aggravated trafficking in drugs, was not against the manifest weight of the evidence.

{¶ 49} Ihrabi's first assignment of error is overruled.

### B. Did Currency Constitute Proceeds or an Instrumentality?

{¶ 50} As stated above, R.C. 2981.02(A)(2) allows for the forfeiture of "[p]roceeds derived from or acquired through the commission of an offense" and of certain instrumentalities. There is nothing inherently illegal about possessing cash. *Dayton Police Dept. v. Byrd*, 189 Ohio App.3d 461, 2010-Ohio-4529, 938 N.E.2d 1110, ¶ 11 (2d Dist.), citing *State v. Roberts*, 102 Ohio App.3d 514, 518, 657 N.E.2d 547 (9th Dist.1995).

{¶ 51} The burden is on the state to show that the money has a connection to the underlying criminal offense. *Byrd* at ¶ 10, citing *State v. Ali*, 119 Ohio App.3d 766, 770, 696 N.E.2d 285 (8th Dist.1997). The state "must demonstrate that it is more probable than not, from all the circumstances, that the defendant used [the money] in the commission of criminal offenses." (Citations omitted.) *Ali* at 769. "The same logic applies regarding sufficient proof that the money was proceeds of the criminal offense."

*Byrd* at ¶ 10.

**{¶ 52}** In analyzing whether the money seized from Ihrabi was subject to forfeiture, the magistrate noted that there was "no Ohio case on point regarding whether an entire sum of money may be seized as proceeds (or an instrumentality) when it is probable that at least some of the money was legitimately gained." While acknowledging the differences in Ohio's and Michigan's statutes, the magistrate followed the reasoning in *In re Forfeiture of $167,200*, 2006 WL 2739316 (Mich.App. Sept. 26, 2006), which described the applicable law, stating:

> Pursuant to MCL 333.7521(1)(f), anything that can be traced to an exchange for a controlled substance is subject to forfeiture. "In order for an asset to be ordered forfeited, the trial court must find that there is a substantial connection between that asset and the underlying criminal activity." If the asset has only an incidental or fortuitous connection to the criminal activity, forfeiture is not warranted. However, the connection between the currency and the criminal activity does not have to be related to a specific instance of drug dealing; rather, the currency need only be traceable to drug trafficking in general.

(Citations omitted.) *Id.* at *1.

**{¶ 53}** Applying this case law, the magistrate court found, and the trial court agreed, that all of the money seized from Ihrabi constituted proceeds and/or an instrumentality of his illegal activities. The magistrate reasoned:

> Because Respondent's drug trafficking activities were based out of the Smoke Shop, the Magistrate finds that the money seized from the shop,

as well as the money in Respondent's car (intended to be deposited in the bank), on Respondent's person, and in Respondent's apartment is subject to forfeiture as "proceeds." The Magistrate is aware that the Smoke Shop sold legitimate, legal merchandise and that some business revenue was generated from these sales. However, a significant portion of the Smoke Shop's revenue was generated from the sale of synthetic marijuana, as indicated by the testimony of Corey Hernandez. Inside the Smoke Shop, officers found drugs, scales, packaging materials including small plastic jars, labels with the names of known synthetic marijuana brands, documentation for the purchase of products with names of known synthetic marijuana names, and pipes. Sgt. Close testified that the shop had posters of Bob Marley and other décor consistent with a "drug culture." The money found at Respondent's apartment, $30,000.00 in cash, was found in the bottom of a trash can, under a trash bag. This is not a typical way to store legitimate business revenue. Additionally, other documentation from known distributors of synthetic marijuana was found at the apartment. In sum, the totality of the circumstances suggests that the money was "proceeds" of the sale of synthetic marijuana and/or an "instrumentality" that would be used to purchase additional synthetic marijuana for future sale at the Smoke Shop.

(Footnote omitted.)

{¶ 54} Forfeiture statutes vary throughout the United States. *See generally* Edgeworth, Dee R., *Asset Forfeiture: Practice and Procedure in State and Federal Courts*

(3d Ed.2014). While we do not adopt the magistrate's recitation of Michigan law, we agree with the trial court that currency subject to forfeiture based on drug trafficking need not be traced to a specific drug transaction, as long as it is traceable to drug trafficking in general.

{¶ 55} As with the trial court, we have found no Ohio authority detailing what currency may be seized when lawfully-obtained currency is likely commingled with currency that constitutes proceeds of drug trafficking. We are persuaded by the approach taken by several federal circuits, which have stated:

> Because money is fungible, once funds obtained from illegal activity are combined with funds from lawful activity in a single account, the "dirty" and "clean" funds cannot be distinguished from each other. As such, "[a] requirement that the government trace each dollar of the transaction to the criminal, as opposed to the non-criminal activity, would allow individuals effectively to defeat prosecution for money laundering by simply commingling legitimate funds with criminal proceeds."

*United States v. Silver*, 864 F.3d 102, 115 (2d Cir.2017), quoting *United States v. Moore*, 27 F.3d 969, 976-77 (4th Cir.1994). Nevertheless, the commingling of cash proceeds of drug transactions with funds derived from legitimate sources does not render the entire amount of money subject to forfeiture as proceeds. *See, e.g., U.S. v. Pole No. 3172, Hopkinton*, 852 F.2d 636 (1st Cir.1988). Rather, the State is entitled to obtain forfeiture only of those amounts which constituted proceeds and/or an instrumentality of the illegal activity.

{¶ 56} In the case before us, Ihrabi operated a business, A&R1 Smoke Shop,

which sold legitimate goods, such as tobacco, shirts, hookah pipes, and other items. Ihrabi admitted that, prior to October 17, 2011, he sold herbal incense. Hernandez, an employee, testified that, after October 17, 2011, the sales of illegal herbal incense were reduced. However, at Ihrabi's direction, Hernandez continued to sell Spice and other illegal herbal incense to select customers (ones who asked for "incense") from October 17, 2011, until the April 2012 raid by the police.

{¶ 57} Upon review of the evidence, it was established by a preponderance of the evidence that a significant portion of the cash located at A&R1 Smoke Shop and Ihrabi's vehicle came from the sale of illegal synthetic marijuana at the shop. Hernandez's testimony suggests that he sold synthetic marijuana in the same manner as legal products; there was no testimony that the sales of synthetic marijuana occurred in a different portion of the store (to the contrary, he indicated that the synthetic marijuana was kept by the cash register) or that the proceeds from the sale of synthetic marijuana were placed in a special location separate from legitimate sales. Ihrabi's business records reflected that revenue at A&R1 Smoke Shop substantially increased once the business started selling synthetic marijuana and that the increased revenue continued into 2012. The business records, invoices, and shipping records supported a conclusion that Ihrabi continued to purchase synthetic marijuana into 2012, which accounted for the continued increase in revenue.

{¶ 58} Ihrabi testified that the $30,000 the located at his apartment was his commission from his business (as reflected in the business's tax return) and that it was derived from the sale of legitimate products at his business, but the trial court could have reasonably concluded that any commission from his business included a substantial

amount of illegal proceeds.

{¶ 59} While there is evidence from which the trial court could have reasonably concluded that some, if not most, of the seized currency constituted proceeds, the record does not support a conclusion that *all* of the money seized from Ihrabi were proceeds of criminal activity.   Stated simply, the money seized from Ihrabi came from the sales from A&R1 Smoke Shop, which sold both legal and illegal goods.   The State has not demonstrated that *all* of the seized funds constituted proceeds.

{¶ 60} It appears that the State lacked documentation that would have been helpful to establish a specific amount of proceeds.   During cross-examination of Ihrabi, the prosecutor questioned Ihrabi about the extent of the business records that had been provided to the State during discovery.   The prosecutor stated:

> You gave me your tax return.   You didn't give me any of the information so I know how – where your money was coming and going.   And for the whole year of 2011, the whole time you were ordering from Spice Kings and SA Wholesale, I didn't get anything from you on how – what money you were bringing in and what money you were spending, you know, where this money was coming from and where it was going.

Regardless, the State was not required to trace the store's revenue to specific transactions, and there was some evidence regarding the amount of the store's revenue that likely came from the sale of synthetic marijuana.

{¶ 61} The record also does not support a conclusion that *all* of the seized money constituted an instrumentality.   An "instrumentality" is "property otherwise lawful to possess that is used in or intended to be used in an offense."   R.C. 2981.01(B)(6).   As

stated above, money can constitute an instrumentality. *Id.*

{¶ 62} Not all instrumentalities are subject to forfeiture. To be subject to forfeiture, the instrumentality must be used or intended for use in the commission of (1) a felony or (2) a misdemeanor, when forfeiture is specifically authorized by a section of the Revised Code or by a municipal ordinance that creates the offense or sets forth its penalties, or (3) an attempt to commit, complicity in committing, or a conspiracy to commit an offense described above. R.C. 2981.02(A)(3). In addition, in determining whether the alleged instrumentality was used or intended to be used in a manner sufficient to warrant its forfeiture, the trier of fact must consider "(1) Whether the offense could not have been committed or attempted but for the presence of the instrumentality; (2) Whether the primary purpose in using the instrumentality was to commit or attempt to commit the offense; (3) The extent to which the instrumentality furthered the commission of, or attempt to commit, the offense." R.C. 2981.02(B).

{¶ 63} Here, there was evidence that A&R1 Trading Company had a business checking account, that deposits were regularly made to that account, and that checks were written from that account to pay for his inventory. Payments from that account included checks to Salah, who apparently was involved in the trafficking of synthetic marijuana and bath salts. Ihrabi testified that the money located in his vehicle was meant to be deposited at the bank. Ihrabi testified that he had not prepared a deposit slip for that money, because he intended to add more money to the deposit. As with its conclusion regarding proceeds, the trial court could have reasonably concluded that "a significant portion" of the money from the store and from Ihrabi's vehicle and person was intended to be used in the purchasing and/or payment for synthetic marijuana.

{¶ 64} There was additional evidence that Ihrabi purchased synthetic marijuana from S.A. Wholesale in Texas, and that he used large amounts of cash to pay his S.A. Wholesale invoices. Ihrabi testified that he had traveled by airplane with large sums on several occasions, and he detailed on cross-examination that he had flown with $47,000 or $56,000 one time, $95,000 a second time, and $100,000 a third time; each time he was traveling to Texas to pay a S.A. Wholesale invoice. The photographs of Ihrabi's apartment show that it was sparsely furnished, but the police located a S.A. Wholesale invoice, travel plans to Las Vegas (where Ihrabi had attended trade shows for distributors and manufacturers), and a business card for another incense distributor. The trial court could have reasonably concluded that the entire $30,000 in Ihrabi's apartment was intended to be used to pay a S.A. Wholesale invoice. Moreover, the trial court reasonably concluded that forfeiture of the $30,000 as an instrumentality was not disproportionate to the offense of trafficking in synthetic marijuana.

{¶ 65} The possession of currency, even a large amount of hidden cash, is not inherently illegal. And there is evidence that Ihrabi lawfully used cash when operating his business, such as by paying Hernandez his salary in cash. (Hernandez admitted, however, to selling synthetic marijuana as part of his employment at A&R1 Smoke Shop.) Nevertheless, the trial court could have reasonably concluded that the State proved, by a preponderance of the evidence, that Ihrabi intended to use the $30,000 located in his apartment to pay for illegal synthetic marijuana and was thus subject to forfeiture as an instrumentality.

{¶ 66} In summary, the State established, by a preponderance of the evidence, that all of the $30,000 in cash seized from Ihrabi's apartment constituted an

instrumentality, and the trial court did not err in ordering that sum to be forfeited. As for the additional currency seized from Ihrabi, the trial court reasonably concluded that "a significant portion of the Smoke Shop's revenue was generated from the sale of synthetic marijuana." However, the trial court erred therefore in ordering *all* of the remaining $4,255 ($70 from Ihrabi's person, $435 from the store's cash register, $250 from the filing cabinet in the back portion of the store, and $3,500 from Ihrabi's Honda) to be forfeited when there was evidence, as noted by the trial court, that at least a portion of the store's revenue was from legal products. The matter must be remanded for the trial court to determine whether all, some, or none of the $4,255 is subject to forfeiture.

{¶ 67} We realize that it may be difficult to determine, with computational certainty, how much of the remaining $4,255 constituted proceeds and/or an instrumentality. It would indeed be simpler to hold, once it is determined that a "significant portion" of fungible property is subject to civil forfeiture, that *all* of the property is subject to forfeiture, or at least that it shifts the burden to the owner to show what portion was legal proceeds. But the Ohio civil forfeiture statute places the burden on the State, which, after all, is seeking to take property from its (until shown otherwise) rightful owner. Consistent with our view that the State need not trace money to specific transactions, the court need not find with accounting precision the amount of Ihrabi's currency that constituted proceedings and/or an instrumentality. Rather, the trial court may make reasonable extrapolations from the facts which were established by a preponderance of the evidence.

{¶ 68} Ihrabi's second assignment of error is sustained in part and overruled in part.

### III. Conclusion

**{¶ 69}** The trial court's judgment will be affirmed to the extent that it determined that the $30,000 from Ihrabi's apartment was subject to forfeiture. The trial court's order of forfeiture regarding the $4,255 will be reversed, and the matter will be remanded for the trial court to determine whether all, some, or none of the $4,255 constituted proceeds and/or an instrumentality. Upon remand, the trial court may again determine how the forfeited property should be distributed.

. . . . . . . . . . . . .

WELBAUM, J. and TUCKER, J., concur.


Copies mailed to:

Adam M. Laugle
Eugene Robinson
Hon. Dennis J. Langer