[Cite as *In re $18,823.06*, 2018-Ohio-876.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: $18,823.06 U.S. CURRENCY   :       APPEAL NO. C-160775
AND A DELL LAPTOP AND HP            TRIAL NO.  M-1401112
SEIZED FROM HOLLY GALVEZ.   :

                                 :           *O P I N I O N.*

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause
                                     Remanded

Date of Judgment Entry on Appeal:  March 9, 2018

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Jeremiah Seebohm*,
Assistant Prosecuting Attorney, for Appellee State of Ohio,

*Santen & Hughes* and *Louis H. Sirkin*, for Appellant Holly Galvez.

**MILLER, Judge.**

{¶1}    Holly Galvez appeals from the judgment of the Hamilton County Court of Common Pleas, which overruled her objections to the magistrate's decision and granted the state's petition for forfeiture of currency.  The trial court ordered that $18,823.06 be forfeited under R.C. Chapter 2981.  For the following reasons, the trial court's judgment is affirmed in part, reversed in part, and remanded for an entry of forfeiture consistent with this opinion.

## I. Facts and Procedural History

{¶2}    On June 25, 2014, the Cincinnati Police Department, in conjunction with other police agencies, executed a warrant to search Galvez's residence as part of an ongoing investigation into a drug-trafficking ring operating in the Northern Kentucky and Greater Cincinnati area.  During the search, officers seized two sets of digital scales with heroin and cocaine residue from a drawer in Galvez's bedroom dresser, a small amount of marijuana, Xanax, a Dell laptop, an HP all-in-one computer, $137 located in a box in Galvez's bedroom, $1,778 located in her purse, and some paperwork.  Immediately after conducting the search, Cincinnati police officers questioned Galvez.  Based on this conversation and the paperwork they recovered during their search, officers seized $16,638.06 from four bank accounts at U.S. Bank belonging to Galvez.

{¶3}    In state court, Galvez was initially charged with possession of drug paraphernalia in violation of R.C. 2925.14, a fourth-degree misdemeanor.  The state amended the charge, and Galvez pleaded guilty to the offense as a minor

2

misdemeanor. The state next filed this action under former R.C. 2981.05[1] seeking to civilly forfeit the $18,823.06 in currency and bank account funds, the Dell laptop, and the HP all-in-one computer as either contraband, proceeds of, and/or an instrumentality used in the commission of a criminal offense.

{¶4} The civil forfeiture action was tried to a magistrate. The state presented testimony from Cincinnati Police Officers Steve Batsch and Matthew Waters. Officer Batsch testified that for several months he investigated a narcotics ring, which mainly trafficked in heroin in Cincinnati, Ohio and Northern Kentucky. Officer Batsch discovered that Michael Williams, the leader of the drug ring, was involved in a relationship with Galvez. Two vehicles registered to Galvez were parked outside Williams's residence in Kentucky, and individuals in the drug ring were operating vehicles registered in Galvez's name on a daily basis.

{¶5} Search warrants were executed at three locations; two in Cincinnati and one in Kentucky. Police recovered heroin from the Kentucky location and one Cincinnati location, and packaging material at the second Cincinnati location. Police arrested Williams and four other individuals. When Williams was arrested, he was driving a vehicle that had been rented in Galvez's name. Williams, Galvez, and the other individuals were also subject to a federal indictment for drug-trafficking and conspiring to traffic drugs. *See United States v. Williams*, S.D.Ohio No. 1:2014-CR-00118 (Dec. 13, 2004).[2]

---

[1] R.C. Chapter 2981 was amended in 2017 by H.B. 347, and the current version became effective April 6, 2017. Under the former version of R.C. 2981.05, the state had to prove its case by a preponderance of the evidence. *See* former R.C. 2981.05(D)(3). The current version requires the state to meet a higher "clear and convincing evidence" burden of proof. We apply the former version here.

[2] The federal criminal complaint against Galvez was dismissed on August 5, 2016, pursuant to Fed.R.Crim.P. 48(a), but the dismissal does not affect the government's pursuit of forfeiture here, as it is required to prove that the money belonging to Galvez constituted proceeds of "an offense," not necessarily proceeds of the offense at issue in *her* criminal case. *See Dayton Police Dept. v. Thompson*, 2d Dist. Montgomery No. 24790, 2012-Ohio-2660, ¶ 11-12.

{¶6}   Shortly after his arrest, Williams directed someone via a monitored jailhouse phone call to remove items from Galvez's residence and tell Galvez to empty one of her bank accounts. The police then conducted a trash-pull at Galvez's residence, determined there were indicia of drugs in the home, and executed the search warrant on Galvez's home.

{¶7}   During questioning at her home, Galvez admitted that Williams was her boyfriend, he had a key to her residence, and he would visit her one to two times a week.   Officer Batsch testified that Galvez told him that Williams had paid her rent money, and $500 to $1,000 a week to rent and use the vehicles titled in her name. Galvez also said that Williams directed her to close a credit card account.   Batsch reviewed Galvez's bank records for an account that showed approximately $23,000 in deposits between February 2014 and the end of June 2014, when Galvez was arrested.

{¶8}   Batsch seized the bank accounts based on his review of the bank statements and Galvez's admissions.   Batsch believed that Williams was indeed providing Galvez money in exchange for renting cars for the drug-trafficking ring and that part, if not all funds were related to the drug-trafficking ring.

{¶9}   Batsch obtained certified copies of Galvez's Ohio tax returns for the years 2011, 2012, and 2013, wherein Galvez had reported an adjusted gross income of $11,316 in 2011, $14,384 in 2012, and $9,659 in 2013.   Batsch testified that police found paperwork relating to Galvez's occupation as an exotic dancer.   He testified that he believed the money Galvez earned from her dancing had been commingled with money she earned from illegal sources.   Batsch also reasoned that had Galvez not been receiving money from Williams, she would have had to use her own money to pay her bills.

{¶10} On cross-examination, Batsch admitted that what police recovered in the trash-pull was indicative of personal drug use and that Galvez had a prescription for the Xanax they found in the home. He further testified that it was his belief that Williams sent someone to collect money or drugs from Galvez's home, but that he had no proof to support this belief, and the police found no illegal drugs or guns in Galvez's residence.

{¶11} When asked if he had any evidence tying the money seized to the two main defendants in the federal indictment, Batsch said that the police had Galvez's admission that Williams had given her money and had access to her room and a key to her home. When asked if he had any way of knowing if the money had been given to Galvez by Williams, he responded, "I guess specifically not."

{¶12} Officer Waters testified that Galvez owned three vehicles that were being driven daily by members of the drug-trafficking ring. Galvez told police that the vehicles were supposed to be titled in another woman's name, but that at the time of Galvez's arrest, the vehicles remained titled in her name. After Galvez's arrest, however, she transferred the title to two of the vehicles to two other women who were associated with men that had been indicted as coconspirators in the federal action.

{¶13} Galvez testified on her own behalf, admitting that she dated Williams for ten to 15 months—from the end of 2012 to June 2014. She said that Williams was very secretive and she was concerned he was cheating on her, but she did not know he was trafficking in drugs. She said she had given Williams money and helped him obtain employment. She acknowledged that she had rented a vehicle one or two times for Williams to use because he did not have good credit, and could not rent one for himself, but said that Williams was listed as the driver on the rental forms. Galvez admitted that

she had let Williams use her vehicle, but she denied ever receiving any money from Williams or putting any money in the bank for him.

{¶14} Galvez owned one vehicle, a Honda Civic, when she met Williams in late 2012, and bought a second vehicle in 2013. Galvez admitted that she signed over the title of a Honda Civic to a woman who had been living with Williams at the time of his arrest, but said the woman never put the title in her name, so the tags and title to the car remained in Galvez's name. Galvez testified that the car was old and she received no money for signing over the title.

{¶15} Galvez testified that she had worked as an exotic dancer since age 18, and that her profession was a lucrative one. At the time of her arrest, she was working for an agency called Cincinnati Seductions. She was paid in cash, and she stored the wadded bills in boxes and bags in her home prior to depositing them in the bank. Galvez testified that her goal was to deposit a minimum of $1,000 a week into her bank account. She paid most of her expenses with a debit card, but some with cash.

{¶16} Galvez testified that she claims a lot of itemized deductions on her tax returns, so she keeps her receipts from her employment logged in a book that she provides to her tax preparer. The police took this receipt book during their search of her residence.

{¶17} Galvez's four bank accounts with U.S. Bank included a savings account, a checking account, a business account for Jayda Promotions, a small company she created for her dancing jobs, and an account for her minor daughter. She claimed all the money in the accounts had been earned through her lawful activities as a dancer and she had no other source of income.

{¶18} Galvez admitted that after she had been processed and released from jail, she went to the bank and tried to withdraw money from her accounts, but she was

unable to do so. As a result, on June 26, 2014, she transferred money from her checking account, Jayda Promotions account, and savings account to the bank account in her daughter's name.[3]

### *Magistrate's Decision*

{¶19} The magistrate ordered the two computers and all the money seized from Galvez forfeited to the state. The magistrate gave the following detailed reasoning for his decision via a lengthy oral pronouncement. Galvez admitted to police that she was Williams's girlfriend. She acknowledged renting cars for him, and she told the police that Williams had paid her $1300 a month. She testified that she earned between $500 and $1000 a week as an exotic dancer, which would put her income in the range of $26,000 to $52,000 a year. Yet she only reported income of $11,316 in 2011, $14,384 in 2012, and $9659 in 2013. Although two scales with cocaine and heroin residue were found in her bedroom, she testified she had no idea the scales were in her bedroom drawer. Two cars registered in her name were being used in heroin trafficking. Williams was arrested in a vehicle that Galvez had rented for him. Although Galvez had testified her goal was to deposit $1,000 weekly into her bank account, the bank records did not reflect these deposits. Galvez "knew things were going wrong" because someone had come to her home to remove property and she had moved all the money in her accounts to her daughter's account after Williams's arrest.

{¶20} The magistrate stated that Galvez acknowledged her rent was $950 a month or $11,940 a year, but that she only reported gross income of, at most,

---

[3] Galvez transferred $11,030.19 from her checking account, $3,481.40 from her Jayda Promotions account, and an unknown amount from her savings account. The record only shows the ending balance of $1,877.16 in her savings account through May 9, 2014. Thus, we assume the transfer was approximately $1,877.16 in June 2014.

7

$14,384. Galvez testified that her rent was $995 a month, but the bank records did not reflect that Galvez paid any rent out of her checking account until April 2014. The magistrate stated that the Hamilton County Auditor's website showed that Galvez's residence was purchased by Monterey LLC in June 2013, and that three payments of $997 were made from Galvez's checking account to Monterey LLC in April, May, and June 2014, but the payments were credited back to Galvez's checking account.

{¶21} The magistrate then discussed the bank statements for each of Galvez's bank accounts.[4] For the account Galvez shared with her minor daughter, the magistrate stated that Galvez produced four statements that showed the account had a balance of $67 on June 25, 2012, and a balance of $149.16 on March 25, 2014. The statements showed a single deposit of $62.16 on January 15, 2013.

{¶22} For the Jayda Promotions account, the magistrate stated that Galvez introduced eleven statements showing that the account had a balance of $8,485.40 on October 31, 2012. With the exception of one $500 deposit in January 2014, the statement showed only withdrawals from the account. The account had a balance of $3,485.40 in May 2014.

{¶23} For the savings account, Galvez produced six bank statements that showed the account had a balance of $975.22 in May 2011 and a balance of $1,877.16 in May 2014. The bank statements showed a monthly $25 deposit into the account.

{¶24} Galvez produced statements for her checking account that showed a balance of $6,467 in May 2012 and a balance of $7,193 on June 10, 2014. The statements showed deposits of $6,995 in April 2012, $2,580.73 in October 2012,

---

[4] Neither the magistrate's discussion of the account balances, nor the bank statements submitted as part of the record, reflect an accurate total amount ($16,338.06) seized by the Cincinnati Police Department at the end of June 2014.

$3,620 in March 2013, $4,401.57 in October 2013, $2,315 in January 2014, $6,809 in March 2014, $4,647 in April 2014, $997 in May 2014, and $6,995 in June 2014. The statements showed expenditures for ordinary activities, bills, and a car rental.

{¶25} The magistrate concluded that the bank statements did not support Galvez's testimony, and found that "there was a commingling of funds from the drug dealer into Galvez's account to pay for her necessities." The magistrate reasoned that if Galvez's adjusted gross income, as reported to the IRS, had been accurate, then she had used drug proceeds to pay for her living expenses. Thus, the state was entitled to the $18,823.06 that had been seized from Galvez's home and her bank accounts. He further reasoned that because Galvez lacked any documentation for the Dell laptop and the HP all-in-one desktop computers, the state was entitled to forfeiture of the computers.

### Galvez's Objections

{¶26} Galvez filed objections to the magistrate's decision, asserting that the state failed to meet its burden of proof to support the forfeiture of the funds in her bank accounts and the computers. Galvez argued that the magistrate's reasoning for ordering the forfeiture of the funds in her bank accounts was erroneous because the magistrate had reasoned that Galvez's failure to report all the earnings from her occupation as an exotic dancer on her income tax returns demonstrated that the money had been obtained through illegal activity.

{¶27} Galvez argued that she had produced bank statements demonstrating that the four bank accounts existed prior to her relationship with Williams and that money had been regularly deposited and withdrawn from the accounts prior to and during her relationship with Williams, and the state did not present evidence connecting the money in the accounts to Williams or any illegal activity. She also argued that the state failed to present any testimony connecting the computers to illegal

9

activity. She asserted that the magistrate applied the flawed reasoning that because she could not demonstrate paperwork showing an arms-length transaction, the computer had been purchased with illegal or unclaimed income.

### *Trial Court's Decision*

{¶28} The trial court sustained Galvez's objections as to the forfeiture of the Dell laptop and HP all-in-one computer, and ordered their return to Galvez. The trial court, however, overruled Galvez's objections with respect to the forfeiture of the funds in the four bank accounts, adopted the magistrate's decision in part, and ordered that all $18,823.06 in currency and funds be forfeited, with 80 percent being forfeited to the Cincinnati Police and the remaining 20 percent being forfeited to the Hamilton County Prosecuting Attorney's Office.

### II. Order of Forfeiture

{¶29} In a single assignment of error, Galvez argues that the trial court's order of forfeiture of $18,823.06 was against the manifest weight of the evidence. However, in the trial court Galvez objected only to that part of the magistrate's decision ordering the forfeiture of funds in her bank accounts, but not the cash found in her residence or her purse. Galvez's failure to object to the magistrate's decision regarding her cash has forfeited all but plain error. *See* Civ.R. 53(D)(3)(b)(iv) (the "waiver rule"); *Bench Billboard Co. v. Cincinnati*, 2016-Ohio-1040, 62 N.E.3d 603, ¶ 19 (1st Dist.).

{¶30} Based upon our review of the record and the case law, we cannot conclude that the magistrate's decision as to Galvez's cash rises to the level of plain error. *See Goldfuss v. Davidson,* 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997) (holding that plain error is limited to "those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice and where the error, if uncorrected would have a material adverse effect upon on

the character of, and public confidence in judicial proceedings"). Therefore, her argument on appeal, and our review, is limited to the trial court's forfeiture of the funds in her four bank accounts—approximately $16,638.06.

{¶31} The appropriate standard of review for a challenge to a judgment as against the manifest weight of the evidence is set forth in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). *Thompkins* states that "[w]eight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Id.* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Weight is not a question of mathematics, but depends on its effect in inducing belief." *Id.* Thus, "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the [judgment] is against the weight of the evidence, the appellate court * * * disagrees with the factfinder's resolution of the conflicting testimony." *Id.* In weighing the evidence, however, the court of appeals must always be mindful of the presumption in favor of the finder of fact, with every reasonable presumption made in favor of the judgment and the findings of fact. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21.

{¶32} "Forfeitures are not favored in law or equity. Thus, the forfeiture statutes, which operate in derogation of private property rights, must be strictly construed * * * so as to avoid a forfeiture of property." *State v. North*, 2012-Ohio-5200, 980 N.E.2d 566, ¶ 6 (1st Dist.). But the state needed to prove its case only by a preponderance of the evidence. *See* former R.C. 2981.05(D)(3).

{¶33} Here, the forfeiture was initiated by the state's allegation that the money seized from Galvez was subject to civil forfeiture under former R.C. 2981.05, because the money was contraband; proceeds derived or acquired from the commission of an offense; or an instrumentality that was used or intended to be used

in any manner to commit or facilitate the commission of a felony criminal offense—specifically, trafficking in heroin. *See* R.C. 2981.02(A)(2) and (3).[5]

{¶34} Generally, the term "proceeds" refers to the profit gained directly or indirectly from an offense. R.C. 2981.01(B)(11). "'Proceeds' may include, but is not limited to, money or any other means of exchange." *Id.* For purposes of the forfeiture statute, an "offense" is defined as "any act or omission that could be charged as a criminal offense or a delinquent act, whether or not a formal criminal prosecution * * * began at the time the forfeiture is initiated." R.C. 2981.01(B)(10).

{¶35} R.C. 2981.03(F) provides that "[a] civil action to obtain civil forfeiture may be commenced as described in section 2981.05 of the Revised Code regardless of whether the offender * * * has pleaded guilty to [or] been convicted of * * * the act that is the basis of the order." *Dayton Police Dept. v. Thompson*, 2d Dist. Montgomery No. 24790, 2012-Ohio-2660, ¶ 11-12; *see State v. Moss*, 5th Dist. Fairfield No. 14-CA-3, 2014-Ohio-5411, ¶ 9 (following *Dayton Police Dept.*); *State v. Bustamante*, 3d Dist. Seneca Nos. 13-12-26 and 13-13-04, 2013-Ohio-4975, ¶ 31; *Marmet Drug Task Force v. Paz*, 3d Dist. Marion No. 9-11-60, 2012-Ohio-4882, ¶ 23.

{¶36} The burden is on the state to show that the money has a connection to the underlying criminal offense. Former R.C. 2981.05(D)(3). The state "must demonstrate that it is more probable than not, from all the circumstances, that the defendant used [the money] in the commission of [a] criminal offense[]." *State v. Ali*, 119 Ohio App.3d 766, 769, 696 N.E.2d 285 (8th Dist.1997). "The same logic applies regarding sufficient proof that the money was proceeds of the criminal offense."

---

[5] On appeal, however, the state seems to have abandoned its claims that the money is contraband or an instrumentality, as they were not argued in its brief. The state only posits that the seized money was proceeds from drug trafficking.

*Dayton Police Dept. v. Byrd*, 189 Ohio App.3d 461, 2010-Ohio-4529, 938 N.E.2d 1110, ¶ 10 (2d Dist.).

{¶37} In the case before us, the state failed to demonstrate that it was more probable than not that all of the money in Galvez's bank accounts constituted proceeds from a criminal offense. The magistrate's decision, which the trial court adopted in part, relied on six items of evidence to support an order of forfeiture— Galvez's tax returns, selective bank statements for Galvez's bank accounts, testimony of Officer Batsch, testimony of Holly Galvez, a federal indictment of a suspected drug-trafficking operation, which included Galvez, and cash and drug paraphernalia seized from Galvez's home. These items basically established that: Galvez was suspected of trafficking drugs by the Cincinnati police and of conspiring to traffic drugs by the federal authorities; Galvez had drug paraphernalia and cash in her possession on the day she was arrested; Galvez's explanation for the money was dubious; Williams paid all or part of Galvez's rent; Williams directed Galvez through an associate to empty one of her bank accounts; and rental cars titled in Galvez's name for Williams's use, for which she was paid between $500 to $1,000 per week, is typical of drug-trafficking operations looking to avoid detection or traffic stops. Based on prevailing case law, these items are insufficient to show by a preponderance of the evidence that *all* of Galvez's seized funds constitute proceeds from drug trafficking.

{¶38} The state focuses much of its efforts on deficiencies in Galvez's explanation for the funds in her bank accounts as compared to her tax returns. The magistrate found her version to be highly suspect. But the central question is not whether Galvez has developed a credible explanation of the discrepancy, which may go more to underreporting taxable income than to showing drug-trafficking proceeds. The burden rests on the state to show how the seized funds constitute

13

proceeds from drug trafficking, and discrepancies in Galvez's story do not help the state's case. *See, e.g., State v. $765 in United States Currency*, 181 Ohio App.3d 162, 2009-Ohio-711, 908 N.E.2d 486, ¶ 28 (reversing trial court's forfeiture order even though authorities were unable to corroborate owner's explanation for his possession of money); *State v. Roberts*, 102 Ohio App.3d 514, 519, 657 N.E.2d 547 (9th Dist.1995) (affirming denial of forfeiture even though the defendant's alibi that he was driving to Cleveland late at night to purchase a car was "implausible"). The state failed to make a sufficient showing that all of the funds in Galvez's bank accounts were the result of drug trafficking, which renders Galvez's strained explanations immaterial.

{¶39} A key oversight in the state's case is that it does not distinguish between the four bank accounts belonging to Galvez and treats all commingled money as subject to forfeiture. However, the forfeiture statute instructs the prosecutor to forfeit only proceeds which can be proven as "derived from or acquired through the commission of an offense." R.C. 2981.02(A)(2). *See Byrd*, 189 Ohio App.3d 461, 2010-Ohio-4529, 938 N.E.3d 1110, at ¶ 10 (holding that the state bears the burden to show the money is connected to a criminal offense); *State v. Ihrabi*, 2017-Ohio-8373, 87 N.E.3d 267, ¶ 52-59 (2d Dist.) (same); *State v. Golston*, 66 Ohio App.3d 423, 434, 584 N.E.2d 1336 (8th Dist.1990) (same).

{¶40} Surprisingly, there is no Ohio Supreme Court authority detailing what money may be seized when lawfully-obtained currency is commingled with currency that constitutes proceeds from drug trafficking. The Second District recently followed a United States First Circuit Court of Appeals decision, finding that "the commingling of cash proceeds of drug transactions with funds derived from legitimate sources does not render the entire amount of money subject to forfeiture as proceeds." *Ihrabi*, at ¶ 55 (citing *U.S. v. Pole No. 3172, Hopkinton*, 852 F.2d 636

14

(1st Cir.1988)). "Rather, the State is entitled to obtain forfeiture only of those amounts which constituted proceeds and/or an instrumentality of the illegal activity." *Id.* *Ihrabi* ultimately held that it was for the trial court on remand to determine whether all, some, or none of the commingled money was subject to forfeiture. *Id.* at ¶ 66.

{¶41} Like the First Circuit, the United States Fifth Circuit Court of Appeals rejected the notion that commingling allows "forfeitability [to spread] like a disease" to encompass legitimate portions of property. *United States v. One 1980 Rolls Royce, VIN No. SRL 39955*, 905 F.2d 89, 90 (5th Cir.1990). Instead, the court held that only the actual proceeds of drug transactions are forfeitable. *Id.* Likewise, the United States Second Circuit Court of Appeals reasoned that "if $100 from the sale of drugs is deposited in an account funded with untainted money, $100 in the account and each $100 withdrawal are all vulnerable to forfeiture, but the Government can obtain only a single forfeiture of $100." *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1162 (2d Cir.1986), fn. 9.

{¶42} We agree with these courts. Only funds that the state can prove to be the actual proceeds of drug trafficking are subject to forfeiture. A court must determine the amount of illicit funds in each account and forfeit only that amount from that account.

{¶43} At the very least, the state should have provided evidence for why the funds in each account represent proceeds from the drug-trafficking operation. After all, each account has specific bank records showing the history of the account's creation and monthly statements showing deposits and withdrawals. And, the state has a timeline for when Galvez became involved with Williams, the suspected drug-trafficking ring leader. So, the state could have offered evidence regarding which deposits along the timeline were derived from the drug-trafficking operation.

15

{¶44} With respect to the account titled in Galvez's daughter's name, the state did not present any testimony or documentary evidence that the money in this bank account was comprised of proceeds from the drug-trafficking ring as that term is defined in R.C. 2981.01(11). The bank statements for this account indicate that the money in the account preexisted Galvez's relationship with Williams, and the state did not present evidence tying the money that had been deposited into the account during the time period that Galvez was involved with Williams to the drug-trafficking ring.

{¶45} The state has the same problem with Galvez's savings account. The account preexisted Galvez's relationship with Williams, and the state presented no evidence tying the money in the account or the small monthly $25 deposits to the drug-trafficking ring.

{¶46} The Jayda Promotions account also preexisted Galvez's relationship with Williams, and the magistrate noted that the account had a balance of $8,485.40 on October 2012, and was spent down to $3,485.40 by May 2014. During the relevant time period, there was only one deposit of $500 in January 2014. No evidence tied this deposit to drug trafficking. Yet the state claims the authority to seize the entire contents of the account.

{¶47} The accounts discussed above were seized based on an impermissible theory of commingling. Galvez's checking account, on the other hand, is directly tied to illicit activity. Large amounts of cash were deposited into the checking account both prior to and during the time of Galvez's relationship with Williams. Officer Batsch testified that he believed the $23,000 in deposits made between February 2014 and the end of June 2014 were proceeds of the drug-trafficking ring; that the amount of money being deposited was inconsistent with the adjusted gross income that Galvez had reported on her income tax returns; and that he believed "part, if not all" of the

16

money in the account represented payments from Williams to Galvez for titling cars in her name for the drug-trafficking ring, for which she admitted being paid $500 to $1,000 per week. Moreover, Williams directed Galvez to empty this account. Based upon our standard of review, a reasonable presumption must be made in favor of the judgment and the finding of fact that the funds in this account were proceeds from drug trafficking.

{¶48} Accordingly, we affirm the judgment in part, reverse it in part, and remand the cause for further proceedings. The trial court's judgment is affirmed to the extent that it determined that the cash from Galvez's home and purse was subject to forfeiture, as this error was itself forfeited by the failure to object. The trial court's order of forfeiture regarding the funds from Galvez's checking account is affirmed. The trial court's orders of forfeiture of Galvez's savings account, Jayda Promotions account, and amounts in her minor daughter's account—prior to the bank transfer of money into her daughter's account on June 26, 2014—are reversed. There is no evidence of drug proceeds being deposited into these accounts prior to the bank transfer. The money in those accounts shall be returned. This matter is remanded for the trial court to order forfeiture of the $11,030.19 transferred from Galvez's checking account to Galvez's daughter's account as proceeds derived from a criminal offense, and to order the return of the money seized from the other accounts— approximately $5,607.87.

Judgment affirmed in part, reversed in part and cause remanded.

MOCK, P.J., concurs.
DETERS, J., concurs in part and dissents in part.

DETERS, J., concurring in part and dissenting in part.

{¶49} I concur with the majority that the funds in Galvez's home and residence are subject to forfeiture based on Galvez's failure to object to the

magistrate's decision and her failure to challenge on appeal that portion of the trial court's order forfeiting the funds. I also agree with the majority's conclusion that the state failed to demonstrate that it was more probable than not that the funds in Galvez's savings account, the Jayda Promotions account, and the account titled in her daughter's name constituted proceeds from the commission of a criminal offense.

{¶50} I disagree, however, with the majority's conclusion that the state met its burden to show that the funds in Galvez's checking account were proceeds of a criminal offense. The state presented no evidence tying the funds in that account to Williams or the drug-trafficking ring. Instead, it maintained that Galvez's admission that Williams had paid her $1000 a month and her rent when coupled with the disparity in income between her tax returns and the money in her bank accounts was sufficient to render the entire amount in her checking account forfeitable.

{¶51} The trial court agreed, concluding that because it was impossible to distinguish those funds from the ones that Galvez had legitimately earned, the state should be entitled to the entirety of the funds in the account. As the majority acknowledges, the state's theory of recovery has been rejected by both federal and Ohio courts because it negates the statutory requirement that the state must connect the seized money to illegal activity. The majority's decision to forfeit the entirety of the funds in Galvez's checking account is not supported by the record and is contrary to the law. As a result, I respectfully dissent from that portion of the majority's opinion.

Please note:

The court has recorded its own entry this date.